UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

SCOTTSDALE INSURANCE COMPANY
and MENTAL HEALTH RISK RETENTION
GROUP,                                                          Plaintiffs,

v.                                          Civil Action No. 3:23-cv-357-DJH-CHL

SEVEN COUNTIES SERVICES, INC.,                                  Defendant.

\* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

Plaintiffs Scottsdale Insurance Company and Mental Health Risk Retention Group (MHRRG) sued Defendant Seven Counties Services, Inc., seeking a declaration of rights under certain insurance policies that Scottsdale and MHRRG issued to Seven Counties. (Docket No. 1, PageID.14–16) Seven Counties filed a counterclaim for breach of contract (D.N. 15), and both parties now move for summary judgment. (D.N. 33; D.N. 34) After careful consideration, the Court will dismiss the petition for declaratory judgment and grant in part and deny in part the parties' motions for summary judgment for the reasons explained below.

### I.

**A.    The Relationship Between Seven Counties and Uspiritus**

Seven Counties is a non-profit corporation that "offers mental and behavioral health services, substance use treatment, and intellectual and developmental disabilities services." (D.N. 34-1, PageID.1370 ¶ 2) In 2018, Seven Counties "entered into a Management Services Agreement [(MSA)] with Uspiritus" (*id.* ¶ 4), a non-profit corporation that "owns and operates the Bellewood and Brooklawn facilities in Louisville, Kentucky." (*Id.* ¶ 3) These facilities "provide[] residential services and care to abused and neglected youths and foster children." (*Id.*)

1

Pursuant to the MSA, Seven Counties agreed to "provide overall management services for and on behalf of Uspiritus." (*Id.*, PageID.1379)  The agreement required Uspiritus to "obtain and maintain" various forms of insurance and "name [Seven Counties], its directors, officers, employees[,] and agents as additional insureds." (*Id.*, PageID.1412)  The parties amended the agreement in 2019 and 2020 and extended the term of the agreement to December 31, 2021.  (*Id.*, PageID.1427)  Seven Counties and Uspiritus "did not execute any written extensions of the [MSA]" after its expiration in 2021 but nevertheless "continued operating" under the same structure.  (D.N. 24-1, PageID.1372 ¶ 7)

## B.    The Underlying Complaint

On July 17, 2022, a seven-year-old child, J.T., died at the Brooklawn facility.  (D.N. 34-1, PageID.1372 ¶ 9; *see also* D.N. 34-2)  J.T. was a "resident of Pilots Cottage on the Brooklawn campus," where "the boys [were] overseen" by Uspiritus's custodial employees.  (D.N. 34-1, PageID.1372 ¶ 9)  On the day of the incident, three custodial employees were supervising J.T.: shift supervisor D.F. and youth-care workers J.P. and A.W.  (*Id.* ¶ 10)  According to Uspiritus's incident report, J.T. "repeatedly opened his door when Staff . . . gave him expectations to close his door" and "then started to come out of his room."  (D.N. 33-6, PageID.1329)  When J.P. and A.W. "approached [J.T.] in his room," J.T. "started threatening to assault" them, "yell[ed]" at them, and "aggressively charged at [J.P.]."  (*Id.*)  In response, J.P. "attempted to secure [J.T.] in a standing cradle."  (*Id.*)  J.P. and J.T. became "unbalanced" and fell on the floor.  (*Id.*)  J.P. and A.W. then held J.T. in a kneeling cradle, with J.P. holding J.T.'s upper extremities and A.W. holding J.T.'s lower extremities.  (*Id.*)  D.F. "entered the room and took over for [J.P.] on upper extremities."  (*Id.*)  At some point during the restraint, J.T. vomited and began crying.  (*Id.*; *see also* D.N. 33-5, PageID.1234)  J.P. "grabbed the impact cushion" and returned to J.T.'s room.  (D.N. 33-6,

PageID.1329)   J.P. took over for A.W. on "securing [J.T.'s] lower extremities," and J.P. "monitor[ed] [J.T.] from her position."  (*Id.*, PageID.1330)  J.T. briefly "continued to struggle in an attempt to pull out of the restraint" but then "appeared to become unconscious."  (*Id.*)  J.P. "put her fingers in [J.T.'s] mouth to see if anything was blocking his airway" and "scoop[ed] out vomit from his mouth."  (*Id.*)   Because J.T. remained unresponsive, J.P. and D.F. performed cardiopulmonary resuscitation (CPR) while A.W. called 911.  (*Id.*)  J.T. was "then transported to a hospital" and subsequently died.  (*Id.*; *see also* D.N. 1-6, PageID.461)

The Office of Inspector General later released a Statement of Deficiencies Report (OIG Report) finding various deficiencies in the facility's conduct.  (*See generally* D.N. 33-5)  Specifically, the OIG Report found that "the facility failed to protect [J.T.] from experiencing an unnecessary Emergency Safety Intervention (ESI)" because "[J.T.] had not placed [himself] or others . . . in harm['s] way before [he] was secured by the hold."  (*Id.*, PageID.1233–34)  It noted that although J.T. threatened to throw a plastic water bottle at A.W., called J.P. "a stupid [expletive]," and "threatened to hit" J.P., J.T. did not actually act on these threats.  (*Id.*, PageID.1229)  Additionally, the report found that "the facility failed to ensure [that] staff monitored and addressed [J.T.'s] physical and psychological well-being," and that it "did not act on [his] symptoms of distress while in the hold (vomiting and crying) before [he] became unresponsive." (*Id.*, PageID.1234)  And finally, the report concluded that the restraint "was not implemented per the facility's physical holding policy or per the training . . . received through [the] Safe Crisis Management (SCM) certification." (*Id.*, PageID.1227, 1234)

J.T.'s estate sued Uspiritus, Seven Counties, unknown entity defendants, and unknown individual defendants in Jefferson Circuit Court. (D.N. 34-2)  The amended underlying complaint alleged that

> [u]pon information and belief, and for unknown reasons, Unknown Individual Defendants, agents or employees of the named Defendants or other Unknown Entity Defendants assaulted and physically restrained [J.T.]. During the restraint, [J.T.] was held in a seated position with his legs straight out in front of his body. His upper extremities were being held at his sides from behind by one staff member and his legs were being held by another staff member. During the technique, one staff member drove her knee forcefully into [J.T.'s] back and used her body weight to push his torso forward almost to the floor. Later, during the restraint, [J.T.'s] position changed so one of his legs had moved behind him and one was still out in front, like a hurdler's position, and his face was pushed to the floor. The incident lasted between 4 and 5 minutes. Over the course of said restraint, [J.T] suffered multiple injuries, including positional asphyxiation rendering him unconscious.

(*Id.*, PageID.1441 ¶ 26)  The complaint further alleged that the "acts and/or omissions committed by the Defendants [were] the proximate cause and/or substantial factor in the cause of" J.T.'s injuries and death. (*Id.* ¶ 32)  Seven Counties ultimately settled the underlying lawsuit after a mediation. (D.N. 34-6, PageID.1490 ¶ 10)

## C.    The Insurance Coverage

Seven Counties maintained insurance coverage with Scottsdale and MHRRG (collectively, "the insurers") during the incident. (D.N. 1-3; D.N. 23-3)  The MHRRG policy contained a Commercial General Liability Coverage Part and a Professional Liability Coverage Part. (D.N. 1-3)  Seven Counties does not dispute that there is no coverage for the incident under the Professional Liability Part, but it does contend that there is coverage under the Commercial General Liability Part.[1] (D.N. 44, PageID.1638–69)  The Commercial General Liability Part of the insurance policy covered certain claims for "bodily injury." (D.N. 1-3, PageID.393)  But it contained two relevant provisions limiting coverage.  First, it excluded coverage for bodily injury arising from "professional service[s]." (*Id.*, PageID.398)  Second, it limited the insurers' liability when "other

---

[1] The Professional Liability Part provided coverage for "wrongful act[s]," which included "any act, error or omission in the furnishing of professional health care services." (D.N. 1-3, PageID.438–39, 443)  But there was an exclusion under this Part for injuries arising from juvenile residential services. (*Id.*, PageID.430)

4

valid and collectible insurance" was "available" to Seven Counties. (*Id.*, PageID.405) The Scottsdale policy was an excess policy, providing insurance on the same terms as the MHRRG policy. (D.N. 23-3, PageID.1101)

Seven Counties attempted to collect on the insurance policies in connection with the underlying lawsuit (*see* D.N. 34-3; D.N. 34-4; D.N. 34-5), but the insurers "repeatedly declin[ed] to defend or indemnify Seven Counties." (D.N. 34-1, PageID.1374) Seven Counties requested that the insurers appear at the mediation to defend Seven Counties, but they never appeared. (D.N. 34-3, PageID.1448; *see also* D.N. 34-6, PageID.1488) Seven Counties also made an insurance claim with Uspiritus's insurance carrier, The Hanover Insurance Group, as an additional insured. (*Id.*; D.N. 1-2) Hanover likewise denied Seven Counties coverage, stating that Seven Counties was "not named as an additional insured." (D.N. 34-1, PageID.1433)

## D.    The Declaratory-Judgment Action and Counterclaims

The insurers subsequently filed this declaratory-judgment action seeking a declaration of rights confirming that "no coverage is provided to Seven Counties Services, Inc. for the Incident under any or all of the terms, definitions, provisions, conditions, exclusions, and endorsements of" the MHRRG policy. (D.N. 1, PageID.16) The insurers also sought a declaration of rights "under the [MSA] and [the insurance policy] issued by Hanover Insurance Company to Uspiritus, Inc., that Seven Counties Services, Inc. was insured thereunder on a primary basis." (*Id.*) Seven Counties filed counterclaims for breach of contract against the insurers. (D.N. 15, PageID.543) Both sides now move for summary judgment. (D.N. 33; D.N. 34)

## II.

Summary judgment is required when the moving party shows, using evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as

a matter of law." Fed. R. Civ. P. 56(a); *see* 56(c)(1). For purposes of summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). The Court "need consider only the cited materials." Fed. R. Civ. P. 56(c)(3); *see Shreve v. Franklin Cnty.*, 743 F.3d 126, 136 (6th Cir. 2014). If the nonmoving party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the fact may be treated as undisputed. Fed. R. Civ. P. 56(e)(2)-(3). To survive a motion for summary judgment, the nonmoving party must establish a genuine issue of material fact with respect to each element of each of its claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) (noting that "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial"). "[T]he interpretation of insurance contracts in Kentucky is a matter of law for the court, and in the absence of factual disputes, may be determined on summary judgment."[2] *Ohio Sec. Ins. Co. v. Rockford Auto., Inc.*, 509 F. Supp. 3d 960, 964 (W.D. Ky. 2020).

Importantly, "[t]he fact that the parties have filed cross-motions for summary judgment does not mean . . . that summary judgment for one side or the other is necessarily appropriate." *Appoloni v. United States*, 450 F.3d 185, 189 (6th Cir. 2006) (quoting *Parks v. LaFace Recs.*, 329 F.3d 437, 444 (6th Cir. 2003)). Instead, "[w]hen reviewing cross-motions for summary judgment,

---

[2] The parties do not dispute that Kentucky law applies to this case. (D.N. 33-1, PageID.1160; D.N. 34, PageID.1357) In casualty-insurance-coverage cases, Kentucky courts generally apply the law of the state that the parties understood as the "principal location of the insured risk" during the policy term. *Lewis v. Am. Family Ins. Grp.*, 555 S.W.2d 579, 582 (Ky. 1977) (quotation omitted). Here, Seven Counties purchased an insurance policy intended to cover facilities in Kentucky. (*See* D.N. 1-3) The parties do not allege that any other state has a significant relationship to the insurance contract or the parties. (*See generally* D.N. 33; D.N. 34) Accordingly, the Court applies Kentucky law. *See Lewis*, 555 S.W.2d at 582.

[the Court] must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Id.* (quoting *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003)).

The insurers argue that they did not have a duty to defend or indemnify Seven Counties under the insurance contracts.  (*See generally* D.N. 33)  Specifically, they argue that the professional-services exclusion and the other-insurance provision absolved them of these duties. (*See id.*)  Seven Counties disagrees.  (*See generally* D.N. 34)

## A.    Jurisdiction under the Declaratory Judgment Act

As a preliminary matter, the Court must determine whether this matter is appropriate for declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201.  Under the Declaratory Judgment Act, the Court "may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).  Courts consider the following factors from *Grand Trunk Western Railroad v. Consolidated Rail Corp.*, 746 F.2d 323 (6th Cir. 1984), when determining whether to exercise jurisdiction under the Act:

> (1) whether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for res judicata[";] (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective.

*Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 554 (6th Cir. 2008) (quoting *Grand Trunk*, 746 F.2d at 326); *see also United Specialty Ins. Co. v. Cole's Place*, 936 F.3d 386, 396 (6th Cir. 2019) (citation omitted).  Federal courts have "unique and substantial discretion in deciding whether to declare the rights of litigants."  *Flowers*, 513 F.3d at 554 (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995)).

7

"The purpose of a declaratory judgment is to enable the parties to obtain adjudication of rights before an actual injury occurs, to settle a matter before it ripens into a violation of the law or a breach of contract." *Time Warner Cable Midwest LLC v. Pennyrile Rural Elec. Coop. Corp.*, No. 5:15-CV-45-TBR, 2015 U.S. Dist. LEXIS 94372, at *22 (W.D. Ky. July 21, 2015) (emphasis removed) (quoting *Daniels v. State Farm Mut. Auto. Ins. Co.*, 2014 U.S. Dist. LEXIS 43860, at *10-11 (E.D. Mich. 2014)). Declaratory judgments therefore "do not serve a useful purpose in coercive tort actions[] or in contract claims where the historical incidents giving rise to liability are finished." *Id.* (quoting *Liberty Mut. Ins. Co. v. Wagner-Smith Co.*, 2007 U.S. Dist. LEXIS 15906, at *6 (E.D. Ky. 2007). For this reason, "courts routinely dismiss the declaratory judgment claim when the facts at hand have already ripened into a cause of action for breach." *Moser v. Menard, Inc.*, No. 1:20-cv-796, 2023 U.S. Dist. LEXIS 163013, at *7–8 (S.D. Ohio Sept. 13, 2023).

Here, the facts giving rise to liability are complete, and Seven Counties filed a counterclaim for breach of contract. *See Time Warner Cable Midwest LLC*, 2015 U.S. Dist. LEXIS 94372, at *22. Because the "adjudication of [Seven Counties'] breach of contract claim will necessarily decide 'the status of the contractual relationship,' declaratory judgment on the same issue is unnecessary and duplicative."[3] *Putman v. Allstate Ins. Co.*, No. 1:21-cv-14, 2021 U.S. Dist. LEXIS 77768, at *8 (S.D. Ohio Apr. 22, 2021). The Court will therefore dismiss the insurers'

---

[3] To the extent that the insurers also seek a declaratory judgment that Seven Counties is not entitled to coverage under the Professional Liability Coverage Part of the MHRRG policy (D.N. 1), the Court likewise declines to extend jurisdiction under the Act. The Declaratory Judgment Act requires an "actual controversy," 28 U.S.C. § 2201(a), which is not present here because Seven Counties concedes that it is not entitled to coverage under that Part. (D.N. 44, PageID.1638–69)

claim for declaratory relief and instead consider only Seven Counties' claims for breach of contract.[4]  (*See* D.N. 15)

## B.    Duty to Defend

An "insurer has a duty to defend if there is any allegation which potentially, possibly[,] or might come within the coverage of the policy." *Blankenship v. Shelter Mut. Ins. Co.*, No. 23-5247, 2023 U.S. App. LEXIS 27637, at *6 (6th Cir. Oct. 16, 2023) (quoting *Thompson v. W. Am. Ins. Co.*, 839 S.W.2d 579, 581 (Ky. Ct. App. 1992)).  "Kentucky courts determine whether [an] insurer has a duty to defend its insured at the outset of litigation 'by comparing the allegations in the underlying complaint'" and known facts at the time of denial "'with the terms of the insurance policy.'" *Id.* (quoting *Westfield Ins. Co.*, 336 F.3d at 507); *see also KSPED LLC v. Va. Sur. Co.*, 567 F. App'x 377, 383 (6th Cir. 2014) (quoting *Lenning v. Commer. Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001)).  If a duty to defend exists, it "continues to the point of establishing that liability upon which plaintiff was relying was in fact not covered by the policy and not merely that it might not be." *Neth. Ins. Co. v. Jeffries Constr., Inc.*, No. 3:10-CV-754, 2013 U.S. Dist. LEXIS 37409, at *17 (W.D. Ky. Mar. 18, 2013) (quoting *James Graham Brown Found., Inc. v. St. Paul Fire & Marine Ins. Co.,* 814 S.W.2d 273, 279 (1991)).  For the reasons explained below, the Court finds that the insurers had a duty to defend Seven Counties.

---

[4] The Court retains subject-matter jurisdiction over the counterclaim pursuant to 28 U.S.C. § 1332(a) (*see* D.N. 1, PageID.1–2; D.N. 15, PageID.543).  *NOCO Co. v. OJ Commerce, LLC*, 35 F.4th 475, 481 (6th Cir. 2022) ("If the counterclaim does present an independent basis of federal jurisdiction, however, the court may adjudicate it . . . despite the dismissal of plaintiff's complaint." (quoting 6 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1414 (3d ed. 2021)).

### 1. Professional-Services Exclusion

The insurance contract here states that the "insurance [policy] does not apply to . . . '[b]odily injury['] . . . due to the rendering or failure to render any professional service." (D.N. 1-3, PageID.398)  The term "professional service," however, is undefined.  (*See id.*)  When a term in an insurance contract is undefined, "the [C]ourt will afford that term its 'ordinary meaning as persons with the ordinary and usual understanding would construe [it].'"  *Gager v. Cincinnati Ins. Co.*, No. 4:14-CV-00036-JHM, 2015 U.S. Dist. LEXIS 38950, at *12 (W.D. Ky. Mar. 26, 2015) (quoting *Transp. Ins. Co. v. Ford*, 886 S.W.2d 901, 904 (Ky. Ct. App. 1994)).  "Kentucky courts have recognized that the term 'professional services,'" when undefined, requires an exercise of "judgment or training."  *DiBeneditto v. Med. Protective Co.*, 3 F. App'x 483, 486 (6th Cir. 2001).  "As to the manner of construction of insurance policies, Kentucky law remains clear that exclusions are to be narrowly interpreted and all questions resolved in favor of the insured."  *St. Paul Fire & Marine Ins. Co. v. Powell-Walton-Milward, Inc.*, 870 S.W.2d 223, 227 (Ky. 1994); *see also Estate of Clem v. W. Heritage Ins. Co.*, 195 F. App'x 328, 332 (6th Cir. 2006); *KSPED LLC*, 567 F. App'x at 383.  "Doubt as to the coverage of a policy should be resolved in favor of the insured."  *Powell-Walton-Milward, Inc.*, 870 S.W.2d at 227.

The insurers first argue that they had no duty to defend Seven Counties because the restraint of J.T. was an emergency service intervention (ESI) technique, which requires training pursuant to Kentucky regulations.  (D.N. 33-1, PageID.1149, 1164)  Kentucky regulations define ESI as "the use of restraint . . . as an immediate response to an emergency safety situation."  902 Ky. Admin. Regs. 20:320 § 1(12).  An emergency safety situation is in turn defined as "an unanticipated resident behavior that places the resident or others at serious threat of violence or injury if no intervention occurs and that calls for an emergency safety intervention."  *Id.* § 1(13).

10

But Seven Counties argues that the insurers' "characterization of the incident as poorly performed ESI is inconsistent with the allegations of the Underlying Lawsuit, which alleged an 'assault' on J.T. using force and positioning far more extreme than a mere 'kneeling cradle hold.'" (D.N. 41, PageID.1615) It further contends that "[n]othing in the Underlying Lawsuit . . . indicates that the [employees] 'assaulted' J.T. in response to a safety threat." (*Id.*, PageID.1616)

In January 2023, the insurers stated that their denial of coverage was based on the facts in the underlying amended complaint. (D.N. 1-7, PageID.466, 466 n.1) But the underlying complaint states only that "for *unknown reasons* . . . Unknown Individual Defendants, agents or employees of the named Defendants and/or other Unknown Entity Defendants assaulted and physically restrained" J.T. (D.N. 34-2, PageID.1441 ¶ 26 (emphasis added)) Therefore, even if the Court were to assume, for purposes of the duty to defend, that ESI was a professional service, the underlying complaint does not contain sufficient facts for the insurers to determine that the act "was in fact not covered by the policy." *Jeffries Constr., Inc.*, 2013 U.S. Dist. LEXIS 37409, at *17. For instance, the underlying complaint describes the act as a restraint but also as an assault. (*See generally* D.N. 34-2) Moreover, the underlying complaint does not state the facts leading up to the incident, including who performed the purported restraint and whether the act was in response to an emergency. (*See generally id.*) Without this information, it is unclear whether the "unknown" employees' acts required an exercise of "judgment or training." *DiBeneditto*, 3 F. App'x at 486. Although the OIG Report later revealed these facts (*see generally* D.N. 33-5), this information was not in the underlying complaint. (*See generally* D.N. 34-2) In sum, at the time of the January 2023 denial, the allegations in the underlying complaint "possibly" came within coverage. *Blankenship*, 2023 U.S. App. LEXIS 27637, at *6. The professional-services exclusion

therefore did not absolve the insurers of their duty to defend. *Blankenship*, 2023 U.S. App. LEXIS 27637, at *6.

### 2.    Other-Insurance Provision

The "other insurance" provision states that

If other valid and collectible insurance is available to the insured for "damages" we cover under **Coverages A.** or **B.** of this Coverage Part, our obligations are limited as follows: . . .

#### b.    Excess Insurance
(1) This insurance is excess over
    (a) Any other valid and collectible insurance, whether primary, excess, contingent or on any other basis: . . . .
    (b) Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured by attachment of an endorsement.

(D.N. 1-3, PageID.405–06)  Pursuant to this provision, the insurers "ask that the Court find that Seven Counties was insured on a primary basis under the Hanover Policy as a matter of law." (D.N. 33-1, PageID.1169)

The Hanover policy required that Uspiritus and Seven Counties have "agreed in a written contract, written agreement[,] or permit . . . to add [Seven Counties as] an additional insured." (D.N. 1-2, PageID.257; *see also* D.N. 38, PageID.1550)  This requirement may have been satisfied by the MSA, which required that "Uspiritus . . . name [Seven Counties] . . . as additional insureds," (D.N. 1-1, PageID.28), but the MSA expired on December 31, 2021.  (D.N. 34-1, PageID.1374–75)  No new written agreement was executed.  (*See id.*)  Seven Counties thus argues that it "had no valid and collectible insurance with Hanover for the Underlying Lawsuit."  (D.N. 34, PageID.1361)  According to Seven Counties, "Hanover confirmed that 'Seven Counties is not named as an additional insured on the Uspiritus policy'" (*id.* (citing D.N. 1-4) (emphasis removed)) because the MSA "expired by its own terms on December 31, 2021," and thus "there was no

12

"*written contract, written agreement[,] or permit*" requiring Uspiritus to add Seven Counties as an additional insured when the incident occurred in 2022.[5] (*Id.*, PageID.1362) In response, the insurers contend that even if the MSA was expired, "Seven Counties and Uspiritus agreed orally to continue operating pursuant to the written terms of the [MSA] indefinitely." (D.N. 38, PageID.1551)

Under the policy, the insurers' obligations are not limited if no other "valid and collectible" insurance is "available" to Seven Counties. (D.N. 1-3) But these terms are not defined in the insurance contract. (*Id.*) "Kentucky courts often refer to dictionaries in order to determine the ordinary meaning of undefined contractual terms." *Veranda Gardens, LLC v. SECURA Ins.*, No. 3:18-cv-611-DJH-RSE, 2019 U.S. Dist. LEXIS 97393, at *5–6 (W.D. Ky. June 11, 2019) (quoting *Encompass Indem. Co. v. Halfhill*, No. 5:12-CV-00117-TBR, 2013 U.S. Dist. LEXIS 178763, at *4 (W.D. Ky. Dec. 20, 2013)). Black's Law Dictionary defines "available" as "[l]egally valid or colorable." *Available*, *Black's Law Dictionary* (12th ed. 2024); *see also Alticor Glob. Holdings Inc. v. Am. Int'l Specialty Lines Ins. Co.*, No. 22-631/22-1641/22-1679, 2024 U.S. App. LEXIS 21439, at *19 (6th Cir. Aug. 23, 2024) (applying Michigan law and noting that "available" means "actually available or accessible, or that which is reasonably available, as opposed to that which is theoretically or hypothetically available"). And it defines "valid" as "[l]egally sufficient" or "binding." *Valid*, *Black's Law Dictionary* (12th ed. 2024).

At the time of their denial, the insurers knew that Hanover had denied Seven Counties' insurance claim. (D.N. 34-5, PageID.1479, 1484) Moreover, the underlying complaint makes no mention of Seven Counties' insurance policies. (*See generally* D.N. 34-2) Therefore, it is not

---

[5] Seven Counties also claims that it "had no better luck attempting to invoke the Hanover Policy's Broadening Endorsement," which "allowed Uspiritus to add an additional insured by written agreement under certain circumstances." (D.N. 34, PageID.1362)

clear from the face of the underlying complaint and Hanover's denial that Seven Counties had other "valid and collectible" insurance "available." *See Blankenship*, 2023 U.S. App. LEXIS 27637, at *6. Accordingly, the insurers' duty to defend was not eliminated because the allegations in the amended underlying complaint, along with the facts known at the time of the denial, could "potentially, possibly[,] or might come within the coverage of the policy." *See Blankenship*, 2023 U.S. App. LEXIS 27637, at *6. Additionally, the insurers cite no authority as to how the Hanover policy would have been "valid" or "available" to Seven Counties if Seven Counties did not satisfy the written-agreement requirement. (*See generally* D.N. 33; D.N. 38; D.N. 40) Although the insurers claim that the agreement was extended orally, they cite no authority suggesting that an oral agreement constitutes a "valid" written agreement under the terms of the Hanover policy, and the Court is aware of none. (*See generally* D.N. 33; D.N. 38; D.N. 40)

In sum, neither the professional-services exclusion nor the other-insurance exclusion absolved the insurers of their duty to defend, and as a result, the insurers had a duty to defend Seven Counties. *Blankenship*, 2023 U.S. App. LEXIS 27637, at *6.

## C.    Duty to Indemnify

Having found a duty to defend, the Court next considers whether the insurers had a duty to indemnify. *Westfield Nat'l Ins. Co.*, 57 F.4th at 562. The duty to indemnify is "narrower than the duty to defend," *Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co.*, 598 F.3d 257, 269 (6th Cir. 2010), and "a separate standard governs each." *KSPED LLC*, 567 F. App'x at 384. While "an insurer has a duty to defend if there is any allegation which potentially, possibly or might come within the coverage terms of the insurance policy," *Aetna Cas. & Sur. Co. v. Com.*, 179 S.W.3d 830, 841 (Ky. 2005), "an insurer has a duty to indemnify only if liability for which indemnification is sought is actually covered by the insurance contract." *KSPED LLC*, 567 F. App'x at 384.

14

Therefore, unlike the duty to defend, courts consider "all facts in the record that go to the issue of coverage even if the insurer was not aware of them prior to making the decision [of] whether to defend." *Id.* For the reasons explained below, the Court finds that the insurers did not have a duty to indemnify Seven Counties under the professional-services exclusion.

Kentucky case law defining the term "professional services" is sparse. Only one Kentucky case, *Ratliff v. Employers' Liability Assurance Corp.*, 515 S.W.2d 225, 230 (Ky. Ct. App. 1974), has analyzed an undefined professional-services term in a similar context. There, the Kentucky Court of Appeals, Kentucky's highest court at the time, found that nurses at a hospital were providing professional services when they allowed a patient to walk from the nurses' station to his room unassisted. *Id.* The court reasoned that the patient's injury was "based upon the failure of the nurses to recognize [the patient's] debilitated condition," and whether he "was capable of returning safely from the nurses' station to his bed required the nurses to exercise their expert professional ability." *Id.* at 230. Since then, only one Sixth Circuit case has analyzed a professional-services term applying Kentucky law. *See DiBeneditto*, 3 F. App'x at 486. Looking to *Ratliff*, the Sixth Circuit found in *DiBeneditto* that professional services require an exercise of "judgment or training." *Id.* (finding that a doctor's sexual harassment of his employees was not a professional service); *see also State Farm Fire & Cas. Co. v. Compliance Advantage*, 471 F. Supp. 3d 796, 802 (E.D. Ky. 2020) (finding that that the professional-services exclusion is "intended to apply to services involving 'any professional training or . . . judgment'"). The Sixth Circuit highlighted the *Ratliff* court's reliance on *Marx v. Hartford Accident & Indemnity Co.*, 157 N.W.2d 870 (Neb. 1968), which stated that courts "must look not to the title or character of the party performing the act, but to the act itself" in analyzing whether an act is a professional service. *DiBeneditto*, 3 F. App'x at 486 (quoting *Marx*, 157 N.W.2d at 872).

The cases cited by *Ratliff* considered several factors in determining whether an act requires a sufficient exercise of "judgment or training." *DiBeneditto*, 3 F. App'x at 486; *see Ratliff*, 515 S.W.2d at 225–30. First, the cases considered whether the act was predominantly manual—which is less likely to be professional—or predominantly intellectual. *See, e.g.*, *Marx*, 157 N.W.2d at 872. Second, the cases assessed whether the act was "routine" or "mechanical." *See, e.g.*, *id.* (holding that a technician's "boiling of water for sterilization purposes alone" was not a professional service because "[i]t was a routine equipment cleaning act which any unskilled person could perform"); *D'Antoni v. Sara Mayo Hosp.*, 144 So. 2d 643, 646–47 (La. Ct. App. 1962) (holding that the act of raising a rail on a patient's hospital bed was not a professional service because it was "purely a mechanical act which any unskilled person could perform"). Third, the cases considered how much the employee was paid. *See Md. Cas. Co. v. Crazy Water Co.*, 160 S.W.2d 102, 105 (Tex. Ct. App. 1942) (finding that a "tubber" was not engaged in professional services, in part because the tubber was only paid $1.60). And fourth, the cases analyzed whether the act required specialized knowledge or whether a layperson could perform the act. *See, e.g.*, *Multnomah Co. v. Oregon Auto. Ins. Co.*, 470 P.2d 147, 150 (Or. 1970) (finding that the administration of insulin by a prison medical technician was a professional service because it demanded specialized knowledge: "the ability to determine whether [the prisoner's] physical condition was such that an injection of insulin was required"); *Tankersley v. Ins. Co. of N. Am.*, 216 So. 2d 333, 334–35 (La. Ct. App. 1968) (finding that nurses exercised "expert judgment in deciding whether or not to make" a call to a doctor about a patient's condition).

In analyzing whether an act requires specialized knowledge, other courts have also considered whether the act required higher education, licensure, or certification, and whether the act was regulated. *See, e.g.*, *Burlington Ins. Co. v. Bay One Sec., Inc.* No. 17-cv-04734-YGR,

2018 U.S. Dist. LEXIS 61700, at *10–12 (N.D. Cal. Apr. 10, 2018) (concluding that a security guard provided professional services, in part because California "required" security officers to be licensed, complete a 40-hour training course, and take refresher courses each year); *Fireman's Fund Ins. v. Gerling Am. Ins.*, No. C 07-06302 CRB, 2008 U.S. Dist. LEXIS 60870, at *22–23 (N.D. Cal. Aug. 11, 2008) (holding that a field service technician did not provide professional services because the position did not require certification, accreditation, or a particular educational degree and was not "subject to a body that regulates or sets forth standards for such personnel"). *Curtis Ambulance of Fla., Inc. v. Bd. of Cnty. Comm'rs*, 811 F.2d 1371, 1380 (10th Cir. 1987) (finding that an emergency medical technician provided professional services because the position required specialized knowledge through certification and 81 hours of training).

The insurers contend that the restraint at issue here is a professional service because J.T.'s death "arose directly from staff members' failure to appropriately determine that an ESI technique was necessary and their failure to safely render a kneeling cradle." (D.N. 33-1, PageID.1164) According to the insurers, "[a] kneeling cradle is an ESI technique," and "[k]nowing when to use ESI and the proper administration of ESI certainly requires specialized training and judgment." (*Id.*) Seven Counties, on the other hand, argues that the employees were not performing ESI because there was no safety threat. (D.N. 41, PageID.1616) It also argues that the employees' "disregard for the ESI procedures . . . leads to the inference that they were . . . inappropriately punishing J.T." and looking to "avoid potential criminal or civil liability by characterizing their actions as an ESI procedure gone wrong." (*Id.*, PageID.1617) Next, it claims that even if the restraint was an ESI, it was still not a professional service because "a restraint is a physical and manual activity," the "employees had no prior professional training," and they were only paid between $15 to $21 per hour. (D.N. 34, PageID.1366) Notably, the OIG Report also characterizes

17

the restraint as incorrectly performed ESI.  (*See generally* D.N. 33-5)  The Court, however, need not determine whether this incident qualifies as an ESI under the Kentucky regulations because, irrespective of whether it is ESI, the Court must examine the act itself.  *See Ratliff*, 515 S.W.2d at 225–30; *Marx*, 157 N.W.2d at 872.

While the Court agrees with Seven Counties that the act of restraining a child is predominantly manual and that the employees were not highly paid, the Court does not consider those two factors in isolation.  *See Marx*, 157 N.W.2d at 872; *Multnomah Cnty.*, 470 P.2d at 150. As an initial matter, J.T. was placed in a particular type of restraint known as a kneeling cradle. (*See* D.N. 33-5)  This restraint technique demanded specialized knowledge and training to be performed safely on a child.  *See Marx*, 157 N.W.2d at 872; *Multnomah Cnty.*, 470 P.2d at 150. For instance, the restraint required specialized knowledge on how to de-escalate the situation; when to "initiate a physical hold," including when to call a physician or licensed practitioner to get an order for a restraint; which type of hold to perform considering effectiveness and safety; how to safely perform the types of holds on children, including where to place pressure on the child's body; how to ensure asphyxiation does not occur during a restraint; how to monitor the child's breathing during the hold; which symptoms indicate asphyxiation; when to speak up for the child's safety or intervene in a hold performed by another staff member; when to release the hold such that the child is no longer a danger to themselves or others; and how to respond to medical emergencies.  (D.N. 33-5, PageID.1209, 1227, 1235–37, 1240, 1268–70)  In other words, the restraint technique requires specialized training on how "to prevent serious harm resulting in" death or injury when performing the hold (*id.*, PageID.1233), which a lay person does not have. *See Tankersley*, 216 So. 2d at 334; 902 Ky. Admin. Regs. 20:320; *cf. D'Antoni*, 144 So. 2d at 646– 47.  Indeed, the OIG Report found that the restraint was not performed "per the training

. . . received through [the] Safety Crisis Management (SCM) certification." (D.N. 33-5, PageID.1227) Although the hold was ultimately performed incorrectly, the employees drew upon (or at least should have drawn upon) their training and specialized knowledge when they made the series of judgments leading up to J.T.'s death. (*See id.*)

Moreover, the act of restraining a child is neither a "mechanical" nor a "routine" act that "any unskilled person could perform" safely. *Marx*, 157 N.W.2d at 872; *D'Antoni*, 144 So. 2d at 646–47. Rather, a restraint is unique to the circumstances presented, including the facts leading up to the restraint, the physical characteristics of the individual being restrained, and the way the individual responds to the restraint. (D.N. 33-5, PageID.1209, 1235–37, 1240)

Finally, the act itself is regulated and requires certification. *See* 902 Ky. Admin. Regs. 20:320 § 15(12); *Curtis Ambulance of Florida, Inc.*, 811 F.2d at 1382. The employees who restrained J.T. were direct-care staff members, required to complete a forty-hour training curriculum pursuant to Kentucky regulations. 902 Ky. Admin. Regs. 20:320 §§ 7(4)–(6). The curriculum included training on "[e]mergency and safety procedures"; "[b]ehavior management, including de-escalation training"; and "[p]hysical management procedures and techniques." *Id.* Kentucky regulations also required that staff carrying out restraints were required to have (a) "documented training in the proper use of the procedure used"; (b) "certifi[cation] in physical management by a nationally-recognized training program in which certification is obtained through skills-based testing"; and (c) "annual training and recertification in crisis intervention and behavior management." *Id.* § 15(12). The employees involved in the restraint here, D.F., J.P., and A.W., received such training, and at least two of the three employees re-trained on physical holds. (*See* D.N. 34-7; D.N. 34-8; D.N. 34-9; D.N. 33-5, PageID.1227) That Kentucky sets standards for

the training these employees must have weighs in favor of finding that the restraint is a professional service. *See Fireman's Fund Ins.*, 2008 U.S. Dist. LEXIS 60870, at \*22–23.

Seven Counties makes several unavailing arguments. First, it argues that professional services are "limit[ed] . . . to licensed professionals." (D.N. 34, PageID.1363) In support, Seven Counties cites Ky. Rev. Stat. § 413.243, which states that "as used in [Ky. Rev. Stat. §] 413.245, professional services means any service rendered in a profession required to be licensed, administered[,] and regulated as professions" in Kentucky. But this Court has rejected the use of § 413.243 to define a professional-services term in an insurance contract in *Massachusetts Bay Insurance Co. v. Safety*, No. 5:19-cv-00048-TBR, 2020 U.S. Dist. LEXIS 125757, at \*12 (W.D. Ky. July 15, 2020). There, the Court noted that § 413.243 "governs statute of limitations for malpractice actions." *Id.*

Second, the cases cited by Seven Counties are distinguishable. For instance, Seven Counties claims that *Keepes v. Doctors Convalescent Center, Inc.* "suggest[s] that non-medical caretaking for children living in institutions, like J.T., does not rise to the level of professional services." (D.N. 34, PageID.1365 (citing *Keepes*, 231 N.E.2d 274, 275–76 (Ill. Ct. App. 1967))) But in *Keepes*, the nurses' aid was simply bathing an infant, and the court concluded that this was not a professional service, in part because the act "was connected with normal living" and would be "done in an ordinary home." 231 N.E.2d at 275–76. A restraint technique, particularly the one used here, is not an act that is "connected with normal living" and not one that would be performed "in an ordinary home."[6] *Cf. id.*

---

[6] Seven Counties also asserts that "relying on" *Crazy Water Co.*, 160 S.W.2d at 104–05, "the *Ratliff* court emphasized that low-wage-earning employees do not provide professional services." (D.N. 34, PageID.1365) But *Ratliff* did not emphasize the employees' pay. *See Ratliff*, 515 S.W.2d at 228. In any event, pay was not the only consideration in *Ratliff*. *See id.* at 225–30. Seven Counties also compares this case to *Progressive Youth Services, Inc. v. Dallas Fire Insurance*

Finally, Seven Counties argues that "[c]ourts have rejected the [insurers'] position that on-the-job training turns lay employees into professionals." (D.N. 39, PageID.1578)  To the contrary, courts have "repeatedly held that a service is 'professional' even though the skills that it demands can be acquired primarily through work experience." *Auto-Owners Insurance Company v. E.N.D. Servs.*, 506 F. App'x 920 (11th Cir. 2013).  Moreover, a strict rule that on-the-job training cannot be professional would contradict the principle that courts must look to the act itself, not the title or characteristic of the person performing the act. *DiBeneditto*, 3 F. App'x at 486 (quoting *Marx*, 157 N.W.2d at 872).

In sum, the direct-care employees were providing professional services when restraining J.T.  Because the restraint in this case required specialized knowledge to be performed safely, is not a mechanical or routine act, required certification, and was regulated in this type of facility, the Court concludes that the restraint required an exercise of professional "judgment or training." *DiBeneditto*, 3 F. App'x at 486; *see also Ratliff*, 515 S.W.2d at 230; 902 Ky. Admin. Regs. 20:320. Accordingly, the act was a professional service under the terms of the insurance contract, and the insurers had no duty to indemnify Seven Counties.  *KSPED LLC*, 567 F. App'x at 384.

---

*Company*, 2003 Tex. App. LEXIS 2321 (Tex. App. Mar. 20, 2003), which found that a restraint of a juvenile was not a professional service.  (D.N. 39, PageID.1579)  But the court in that case denied the motion in a single paragraph, and therefore this Court does not know what type of restraint was performed or whether the employees were trained or required to be trained in restraints.  *Id.*  These facts are available here and indicate that the employees were professionals.

## III.

For the reasons set forth above, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** as follows:

(1)     Scottsdale's petition for declaratory relief (D.N. 1) is **DISMISSED**.

(2)     Scottsdale and MHRRG's motion for summary judgment (D.N. 33) is **GRANTED** in part and **DENIED** in part.  It is **GRANTED** as to the insurers' duty to indemnify.  It is **DENIED** as to their duty to defend.

(3)     Seven Counties' motion for summary judgment (D.N. 34) is **GRANTED** in part and **DENIED** in part.  It is **GRANTED** as to the insurers' duty to defend.  It is **DENIED** as to their duty to indemnify.

(4)     This matter is **REFERRED** to U.S. Magistrate Judge Colin H. Lindsay to oversee the parties' efforts to reach an agreement regarding any damages owed.  (D.N. 32; D.N. 34-11) Judge Lindsay **SHALL** conduct a status conference within **thirty (30) days** of entry of this Order.

August 13, 2025

**David J. Hale, Judge**
**United States District Court**

22